501 So.2d 333 (1987)
Adele S. PALERMO, Individually and on behalf of her dependent child, Amy Cherie Palermo, Plaintiff-Appellant,
v.
RELIANCE INSURANCE COMPANY, et al., Defendants-Appellees.
No. 86-29.
Court of Appeal of Louisiana, Third Circuit.
January 15, 1987.
Writ Denied March 13, 1987.
*334 Raggio, Cappel, Stephen A. Berniard, Jr., Lake Charles, for plaintiff-appellant.
Plauche, Smith & Nieset, Allen L. Smith, Jr., Lake Charles, Alan K. Braud of Mouton & Assoc. Lafayette, for defendants-appellees.
Before DOMENGEAUX, FORET and STOKER, JJ.
STOKER, Judge.
Ronald Palermo drowned while surf bathing at a resort on the Pacific coast of Mexico while on a recreational-social trip sponsored by and largely paid for by his employer. Adele S. Palermo, widow of Ronald, seeks worker's compensation on behalf of herself and her dependent child, Amy Cherie Palermo. The issue in this case is whether or not Ronald Palermo's drowning death arose out of and in the course of his employment within the contemplation of the compensation law. The trial court concluded that it did not and rejected plaintiff's demands by granting a directed verdict in favor of the defendants.[1] Plaintiff appeals. We affirm.
While we approach the case by considering whether the trial court was clearly wrong (manifestly erroneous) under the peculiar and unusual circumstances or whether it misapplied the law, we in fact must determine whether the ambit of the worker's compensation law should, as a matter of policy, be extended to cover the unusual factual circumstances of the case. W. Malone and H. Johnson, Louisiana Civil Law Treatise Section 149 (2d Ed.1980), and Jackson v. American Ins. Co. 404 So.2d 218 (La.1981).

FACTS
As we must decide this case on the basis of its own facts, we must recite them in some detail.
Ronald Palermo was an accountant, a professional employee. Originally, he worked as assistant to the comptroller directly for a corporation entitled Dunham-Price, Inc. The principal owners of that corporation were Robert W. Price, Robert W. Price, Jr., Ted W. Price and Ted W. Price, Jr. This corporation was in the concrete business. For various reasons a separate corporation was formed for the purpose of engaging in construction contracting. Among other objectives this would permit construction activities without putting Dunham-Price, Inc. in competition with its customers. Robert W. Price, Jr. was made the sole stockholder of the new corporation, and it was given the name of *335 Robert W. Price, Jr. Contractors, Inc. (Contractors).
The first project undertaken by Contractors was the construction of a Hilton Hotel in Lake Charles, Louisiana, which was owned by a partnership consisting of the four stockholders of Dunham-Price, Inc. Robert W. Price, Jr. appears to have been the manager or chief executive officer of Contractors. Through arrangement with Dunham-Price, Inc. certain employees, including Ronald Palermo, were transferred to work for Contractors. It was apparently intended that this arrangement would last for an indefinite time, as the partners contemplated construction of other projects as investments. For convenience and various advantages, such as savings in bookkeeping, four transferred employees, including Palermo, remained on the payroll of Dunham-Price, Inc. and under its group insurance program. This arrangement gave rise to an issue as to whether Palermo was a borrowed employee. Contractors reimbursed Dunham-Price, Inc. for the salaries paid the four employees. (Actually two of the employees, Dick Bahr and Harvey Moore, had not previously been employees of Dunham-Price, Inc., but came to work for Contractors.)
Ronald Palermo was a salaried employee and did not receive overtime pay. He and the other three Dunham-Price, Inc. employees were directly involved with Robert W. Price, Jr. in the management of the construction of the Lake Charles Hilton Hotel. They were administrative personnel. Contractors had a contract deadline to meet. The hotel owners had announced an opening date of the hotel at a time subsequent to the date on which completion was required by the contract. As it turned out, completing the hotel by opening time placed the four administrative employees and Price under exceptional pressure. It was necessary for them to work beyond normal working hours in order to meet the projected opening date. Apparently, most, if not all, of the actual work was done through subcontractors.
As a relief from the pressure the employees were under, Price conceived the idea of the group taking a trip when the project was completed. Price left it to the employees to select the place to which they would like to go. He testified that he did not broach the idea of the trip as an incentive to induce the employees to work harder to meet the completion date. It was not intended as a bonus. He intended it as a reward for a job well done, and to permit the employees to "get away and relieve some of the pressure that had been on them." Price also testified that he did not give the trip with the expectation of recovering some kind of improvement in employee relations. He did expect it to improve morale, including his own.
The three male employees decided on a fishing trip to the coast of Mexico on the Pacific Ocean. Spouses were not invited. One of the four employees was Mrs. Pat El Khansa, who declined Price's offer of the trip. Price transported the parties from Lake Charles to Houston in his private plane where they were joined by two friends of Price. From there the group (now including non-employees) took a commercial flight to a Mexican resort town on the Pacific coast. Price paid for all transportation, lodging, most meals, and the cost of the deep-sea fishing trip. The individuals paid for individual sideline activities, such as meals and motor bike rentals.
The group went on the deep-sea fishing trip on Friday, September 24, 1982. On the following afternoon Palermo drowned while swimming in the surf with one of the other administrative employees.

PARTIES TO SUIT
Adele S. Palermo, widow of Ronald Palermo, brought this suit on behalf of herself and her child, Amy Cherie Palermo, against the following defendants: Robert W. Price, Jr. Contractors, Inc. and its worker's compensation insurer, Reliance Insurance Company; and Dunham-Price, Inc. and its worker's compensation insurance carrier, Northwest Insurance Company. On separate motions made by plaintiff the trial *336 court dismissed Contractors and Northwest Insurance Company. Following presentation of plaintiff's evidence, the trial court directed a verdict in favor of defendants. (See footnote 1) Plaintiff appealed from this adverse judgment.

ISSUES AND APPLICABLE LAW
In granting defendants' motion for a directed verdict the trial court stated: "[U]nfortunately I do not think that worker's comp extends to the facts of this particular case." Also: "I ... cannot find that the facts as presented fit within the law." Presumably this expresses the opinion that Ronald Palermo's death did not arise out of or in the course of his employment.
It is basic to our compensation law that injury or death must arise out of and in the course of employment before compensation benefits shall be due. LSA-R.S. 23:1031. For a time in the Louisiana jurisprudence the two concepts of "arising out of" and "in the course of" were muddled. Since then the two concepts have been clarified and harmonized. In Lisonbee v. Chicago Mill and Lumber Company, 278 So.2d 5 (La.1973) the Louisiana Supreme Court stated:
"The terms arising out of, and in the course of are not synonymous. The former suggests an inquiry into the character or origin of the risk, while the latter brings into focus the time and place relationship between the risk and the employment. The two requirements cannot, however, be considered in isolation from each other. A strong showing by the claimant with reference to the arise-out-of requirement may compensate for a relatively weak showing on the during-course-of requirement, or vice versa. As a corollary it follows that whenever the showing with respect to both requirements is relatively weak a denial of compensation is indicated. Malone, Louisiana Workmen's Compensation, §§ 162, 192.
"These concepts are developed from cases interpreting the spare phrases arising out of the employment, and in the course of the employment. But the question of which risk shall be included within the act and which shall be excluded cannot be decided by phrases. Each case must be determined from its own facts. Kern v. Southport Mill, 174 La. 432, 141 So. 19 (1932); Myers v. Louisiana Ry. & Nav. Co., 140 La. 937, 74 So. 256 (1917)."
Malone and Johnson in the text of their treatment of the subject of workers' compensation in the Louisiana Civil Law Treatise cited above discuss the dual requirements in Chapter 7. In Section 149 after discussing certain cases in the jurisprudence decided since Lisonbee the authors state the following conclusions:
"These decisions and others seem to indicate that the Louisiana courts have begun to recognize the interplay between the two features of the dual requirement concept, and are rather frankly viewing the question of compensability in its proper perspective. It should be recalled, however, that, like the practice of analyzing tort problems with a so-called duty-risk concept, the use of the dual requirement is merely an approach to the process of judicial decision making. It is an honest effort by the court to do justice in the case within the guidelines provided legislatively. It is not intended to be, nor should it be frozen into, a formal rule or a doctrine. There is no substitute for an analysis of each situation upon its own facts, with a decision to be reached by weighing the relative merits of the showing of whether the injury was in the course of employment and arose out of the employment." (Footnotes omitted)
Recently a panel of this court had occasion to consider and apply the dual requirement concept. In Sanders v. Chesson, 467 So.2d 1388 (La.App.3d Cir.1985) the following discussion is set forth at page 1390:
"[1] In order to be entitled to worker's compensation benefits, an employee must show that the injuries received were due to an accident `arising out of' and `in the course of' his employment. *337 La.R.S. 23:1031; King v. Wilson Bros. Drilling Co., Inc., 441 So.2d 68 (La.App. 3rd Cir.1983), writ denied, 443 So.2d 598 (La.1983). The terms `arising out of' and `in the course of' are not synonymous, but must be considered together. Lisonbee v. Chicago Mill & Lumber Co., 278 So.2d 5 (La.1973).
"Our courts have had little difficulty in formulating a test for determining whether an employee was within the course of employment when injured. An accident occurs in the course of employment when it happens during the time of employment and at a place contemplated by the employment. Guidry v. Sline Industrial Painters, Inc., 418 So.2d 626 (La.1982).
"However, the test to decide whether an accident arose out of the employment has occasioned our courts some difficulty. In Myers v. Louisiana Ry. and Navigation Co., 140 La. 937, 74 So. 256 (1917), the Louisiana Supreme Court observed that in order to meet the requirement of `arising out of', "[i]t ought to be sufficient that the nature of the employment was such that the risk from which the injury resulted was greater for the workman than for a person not engaged in the employment....". Later in Kern v. Southport Mill, 174 La. 432, 141 So. 19 (1932), our Supreme Court set forth a different test to be employed in determining whether the accident arose out of the employment. In Kern, the court stated:
"`In determining ... whether an accident "arose out of" the employment, it is necessary to consider only this: (1) Was the employee then engaged about his employer's business and not merely pursuing his own business or pleasure; and (2) did the necessities of that employer's business reasonably require that the employee be at the place of the accident at the time the accident occurred?'
"It has been suggested that where an employee's actions fall squarely within the course of his employment, any risk that he may encounter will be considered as arising out of the employment. However, in situations where there is doubt concerning whether the employee is within the course of his employment, compensation will be allowed only when the employment has exposed the claimant to a greater risk than that to which the general population might have been exposed. W. Malone and A. Johnson, `Workers' Compensation Law and Practice', 13 Louisiana Civil Law Treatise (2d ed. 1980), § 193 at pages 392-393; see also, Whitney v. U.S. Fid. & Guar. Ins. Co., 373 So.2d 728 (La.App. 2nd Cir.1979), writ denied, 376 So.2d 320 (La.1979)."
For other cases applying the dual requirement test see those cited in the Pocket Part at 13 Louisiana Civil Law Treatise Section 149, n. 61. The two requirements are discussed at length by Malone and Johnson in Chapters 8 and 9 of that treatise. In Section 193, contained in Chapter 9, the authors make these pertinent observations:
"Thus the Lisonbee decision, while discussing `increased risk', seems clearly to be an additional example of the validity of the theory of the interdependence of the two concepts and the continuing usefulness of the hybrid test evolved by the Louisiana judiciary from the Myers and Kern cases. That test, simply stated, is that whereas in Kernthe employee is actively at work or standing by for an immediate return to his task and thus is squarely within the course of his employment, virtually any risk will be considered as arising out of the employment, whether it is an `increased risk' or not. But where there is some doubt about whether the employee is within the course of his employment, compensation will be allowed only when the employment seems to have exposed the claimant to a greater risk than those to which the general population might have been exposed. To express this notion, Myers might be used. But the procedure reflected by the use of these two cases remains the only genuinely useful and predictable tool to resolve these mattersa *338 consideration of the dual requirement and the interdependence of the two concepts which compose it." (Footnotes omitted)

APPLICATION OF DUAL REQUIREMENT TO THIS CASE
Tested against the legal principles outlined above, we now consider whether the trial court in this case was clearly wrong or whether it misapplied the law, as urged by Mrs. Palermo as appellant, in granting a directed verdict in favor of defendants.
Louisiana appears to have considered only one case involving compensability resulting from accidents which occur on purely recreational or social trips taken by employees which are employer-sponsored and paid for. This is the case on which plaintiff relies. It is Jackson v. American Ins. Co., supra, a 1981 case which deals with a drowning at a swimming party. Appellant's counsel cites cases from other jurisdictions, but we must apply the specific jurisprudential rules of the cases discussed above.
Other than the fact that an employee drowned in each instance, we find little similarity between the Jackson facts and the facts of this case. In Jackson a sixteen-year-old CETA employee drowned in a pond at an "employer" sponsored swimming party. The trial court found that Jackson's death was covered by the compensation law. The Court of Appeal for the Second Circuit reversed (with Judge Marvin dissenting from a refusal to grant a rehearing), at 391 So.2d 1339 (La.App.2d Cir.1980). With two dissents the Supreme Court reversed the Court of Appeal and reinstated the trial court judgment.
The Supreme Court stated its approach in these terms: "The chief question presented is whether the trial court was clearly wrong in its factual finding ... and/or erroneous in its application of the law." 404 So.2d at 220. As there appears to have been no dispute concerning the facts of the case, the correctness of the application of law would seem to be the essential question of the Jackson case. The Supreme Court stated the facts in the following language:
"The facts giving rise to this litigation are as follows. In the summer of 1978, the Coordinating and Development Council of Northwest Louisiana 1 adopted a program funded under the federal government's Comprehensive Employment and Training Act (CETA) which program was designed to provide summer employment for a nine week period to economically disadvantaged youths. Joe Dennis Jackson was one of several youths so employed by the program.
"The youngsters were supervised by one Carolyn Huseth. Their duties included cutting grass, picking up litter, and doing general maintenance labor in and around the small community of Rodessa, Louisiana, in Caddo Parish. It was conceded at trial that the boys rarely worked a full eight hour day even though they usually received credit for four eight hour days per week.
"On Thursday, August 10th, the last day of the summer program, Mrs. Huseth took the youngsters to do some work near the home of a Mr. Buehler, a municipal employee. At approximately 10:00 a.m. that morning, Mrs. Huseth informed the boys that, as she had promised earlier in the week, she would take them to a pond several miles out of Rodessa for a swimming party to celebrate the end of the program. There was testimony that the boys were informed that their attendance at the party was not mandatory, although this matter was in dispute at trial. Time sheets had already been turned in by Mrs. Huseth, giving all the boys credit for the concluding week's work, including Thursday, August 10th. With the exception of two boys who found their own way to the party, the group was transported to the pond by Mrs. Huseth in her truck. While wading at the pond, Joe Dennis Jackson accidentally drowned.
1." The Coordinating and Development Council of Northwest Louisiana is comprised of *339 ten parishes in that area of the state and was formed to administer various state and federally funded projects
An understanding of the rationale of the Jackson decision can no doubt be aided by a reading of Judge Marvin's dissent from the Court of Appeal's refusal to grant a rehearing in Jackson. Judge Marvin argued that the appellate court majority had not approached the question of compensability in the proper prospective dictated by the jurisprudence represented by Lisonbee.
The Supreme Court took such an approach. It began with a preamble:
"Our assessment of the question of coverage under the Louisiana compensation statute must be accomplished in light of the jurisprudence of this state. Furthermore, an analysis of the `in the course of' requirement if oversimplified by its relegation to several boilerplate questions. The determination of coverage is a subjective one in that each case must be decided from all of its particular facts. Lisonbee v. Chicago Mill and Lumber Company, 278 So.2d 5 (La. 1973)." 404 So.2d at 220.
With respect to the applicable law the Supreme Court in Jackson, speaking through Justice Calogero, found that the "arising out of" requirement was satisfied by two factors: (1) attendance at the swimming party was mandatory, and (2) "the degree to which the employer's purpose was served by the activity which gave rise to the injury."
The Supreme Court found attendance was mandatory because there was a "compulsion" growing out of the fact that the CETA employees were adolescents dealing with an adult. The court found that adolescents take suggestions as direct orders; therefore, the suggestion of the supervisor that all employees go on a swimming party amounted to compulsion.
The court found that the "arising out of" requirement was also supported by the fact that the outing served the purposes of the federally funded CETA program, which included among its goals "the advantages to be derived from community goodwill, the instillment of discipline, and improved relations between the underadvantaged youth and the institution of government."
The Supreme Court found the "in the course of" requirement to be filled because it generally refers to time and place of the accident as it related to that of employment. Justice Calogero wrote that the CETA program was a sort of "floating" operation, and the work place was wherever the employees were sent during working hours. The opinion quotes Larson, Worker's Compensation Section 22:23 (Desk Ed. 1977), to the effect that when the employer gives a company party "both the time and space limits of the employment are expanded to picnic day at the picnic grounds."
In summary we conclude that the Supreme Court found coverage in Jackson because the CETA employees really had no choice but to attend the outing. The program was a rather loose summer program, the purpose of which was to keep students busy and to permit them to earn some income; the work place was not fixed but was mobile at the direction of the supervisor, and the accident took place during customary working hours.
Reverting to the Palermo case before us and comparing it with Jackson, and deciding this case on its own facts, we see no compelling precedent in Jackson which requires us to reverse the trial court. We find the facts of this case quite dissimilar to the Jackson facts, and a different result should be reached.
At the outset we note that the employee group consisted of adult professional administrative persons. While there was an employer-employee relationship, it is obvious that the group was closely knit and we find no suggestion or reason to believe that the three employees who took the trip were compelled to accept, or were intimidated into accepting, the employer's largess. Despite the employer-employee relationship, there apparently was no great difference in social standing between them, and the nature of the trip demanded rapport and compatibility between the parties. Mrs. El Khansa declined to go on the trip with *340 impunity. The employer left the decision as to what to do or where to go up to Palermo and the other employees. We cannot conclude that taking the trip was mandatory. The trip served no business purpose. No business was transacted on the trip, and Price testified none was discussed. (In Jackson it is fair to say that the very act of playing and swimming was the employer-assigned work.)
The trip lost some of the "company" character when Price brought two of his non-employee friends into the venture at Houston. While at the Mexican resort only the deep-sea fishing trip was participated in by the entire party. Otherwise, the individuals chose their own activities and amusement. The swim in the surf which led to Palermo's drowning was not company directed. In fact, only Palermo and one other co-employee were engaged in swimming at that time. The purpose of the trip was purely recreational, intended for rest and relief from excessive work under pressurized conditions. The employer derived no benefit from the enterprise, and the purpose could have been accomplished as easily by giving the employees a few days off to spend with their families. We find no company purpose was served, and the trip was offered simply as a gesture of gratitude.
Under the circumstances discussed above we find that the death of Ronald Palermo did not arise out of his employment.
We now move to a consideration of whether the so-called "greater risk" notion should bring this case under compensation coverage. The notion comes from a meshing and interdependence of the holdings of the Myers and Kern cases, as noted in the excerpt from the Malone and Johnson treatise cited above. In Sanders v. Chesson, supra, the opinion writer observed:
"It has been suggested that where an employee's actions fall squarely within the course of his employment, any risk that he may encounter will be considered as arising out of the employment. However, in situations where there is doubt concerning whether the employee is within the course of his employment, compensation will be allowed only when the employment has exposed the claimant to a greater risk than that to which the general population might have been exposed."
(Emphasis supplied)
In this case presence at the Mexican resort for deep-sea fishing and other recreation does not manifestly "fall squarely within" the course of Palermo's employment. Because we have concluded definitively that Palermo's death did not arise out of his employment, we need go no further. However, to put the matter to rest we state our opinion that the trip in question, even bathing in the surf, exposed Palermo to no greater risk than that to which the general population might have been exposed. Who besides the general public goes bathing in the ocean surf? Confining ourselves to the resort where Palermo met his unfortunate death, we would say that anyone who went swimming in the surf there would be a member of the general public. Although the distance and cost factors might reduce the numbers of members of the general public who might go surf bathing at that particular resort, they still would be members of the general public. The risk to which Palermo was exposed, therefore, was no greater than that to which the general public was exposed.

CONCLUSION
In summary, we find there was no essential or substantial connexity between Palermo's employment and the recreational trip in question such that the trip became a part of his employment. The trip was offered solely as an expression of gratitude to the affected employees. No business of Contractors was conducted or discussed. Contractors reaped no advantage from the trip. It served no company purpose. We do not believe that an adult professional employee, who is rewarded as Palermo was, is going to be more loyal or conscientious in the future merely because his employer gives him a free recreational trip. If in *341 fact the trip was offered prior to completion of construction of the Hilton Hotel, we doubt that it caused Mr. Palermo or his co-employees to work harder or more diligently. We cannot believe there was any compulsion for the employees to accept the offer of the trip. One employee did decline to accept the offer. In view of the professional status of the employees, there is nothing to suggest that they were in any way intimidated into accepting the trip. In short, the facts of this case fit none of the criteria or tests followed in Jackson v. American Ins. Co., supra. In that case the Supreme Court quoted the following passage from Larson's treatise cited above:
"Recreational or social activities are within the course of employment when
(1) They occur on the premises during a lunch or recreation period as a regular incident of the employment; or
(2) The employer, by expressly or impliedly requiring participation, or by making the activity part of the services of an employee, brings the activity within the orbit of the employment; or
(3) The employer derives substantial direct benefit from the activity beyond the intangible value of improvement in employee health and morale that is common to all kinds of recreation and social life." (Emphasis supplied)
In the words of item (3) listed by Larson, the only benefit reaped by the employer was an "intangible value of improvement in employee health and morale that is common to all kinds of recreation and social life."
Our decision makes it unnecessary to consider the "borrowed employee" issue.
For the foregoing reasons we affirm the judgment of the trial court. The costs of this appeal are assessed to plaintiff-appellee.
AFFIRMED.
FORET, J., dissents and assigns written reasons.
FORET, Judge, dissenting.
I respectfully dissent from the decision reached by the majority.
This appeal presents us with a threshold issue of whether the accident which caused the death of plaintiff's husband, Ronald Palermo, arose out of and in the course of his employment.

FACTS
Plaintiff's husband, Ronald Palermo, had been an employee of Dunbar-Price, Inc. for a number of years. Sometime in 1981, he began working under the day-to-day supervision of Robert W. Price, Jr. Contractors, Inc. The principal owners of Dunbar-Price were Robert W. Price, Robert W. Price, Jr., Ted W. Price, and Ted W. Price, Jr. In 1979, these four men wanted to acquire depreciable real estate and decided to undertake one or more construction projects. Not wanting Dunbar-Price, Inc., which is in the concrete business, to compete with contractors in the area, the four agreed that a separate corporation should be formed to act as contractor on their real estate projects. Robert W. Price, Jr. Contractors, Inc. (Contractors) was formed for this purpose. The sole stockholder of Contractors was Robert W. Price, Jr.
Contractors' first project was the construction of a Hilton Hotel in Lake Charles. The four Prices were the general partners in the limited partnership which contracted for the construction of the hotel and became its owner. A few months before the construction of the hotel began, the four men decided to use three or four of Dunbar-Price's employees on the construction of the project. Robert Palermo was among these. Dunbar-Price continued to maintain these employees on its payroll, and Contractors reimbursed Dunbar-Price. The Prices hoped that Contractors would be able to continue operations after the construction of the Hilton Hotel, in which case, Palermo would have continued working for Contractors. However, if Contractors did not continue operations, it was anticipated that Palermo would return to his former *342 position with Dunbar-Price, apparently with no loss of seniority.
The scheduled opening date for the hotel was August 1, 1982. In order to meet this deadline, Palermo and other administrative employees of Contractors worked overtime and on weekends during the final months of construction. As a salaried employee, Palermo was not paid any additional compensation for this extra work. Sometime during this period, Robert W. Price, Jr. suggested that he and his four administrative employees, which included Palermo, should take a trip following the completion of the hotel. Price offered to pay for this trip, but left the destination up to the employees.
The employees eventually decided on a fishing trip to the Pacific coast of Mexico. Although offered the opportunity, Pat El Khansa, the only woman among the four administrative employees, decided not to take the trip. On Thursday, September 23, 1982, Robert W. Price, Jr., Palermo, and two other administrative employees left Lake Charles in a private plane owned by Price. They flew to Houston, where they were joined by two personal friends of Price. From there, the group took a commercial flight to Mexico. Price paid for all transportation, lodging, most meals, and the cost of the deep-sea fishing trip. On Friday, September 24, 1982, the group went on a deep-sea fishing trip off the coast of Mexico. The next day, on the afternoon of September 25, Palermo drowned while swimming in the surf with one of the other administrative employees.
Palermo's widow filed this action for worker's compensation death benefits, individually and on behalf of her minor child. Following the presentation of plaintiff's case in chief, the trial court entered a directed verdict in defendants' favor. The trial court was apparently of the opinion that plaintiff had failed to show that her husband's death arose out of and in the course of his employment.

DUAL REQUIREMENTS
A worker is entitled to worker's compensation benefits for personal injury only when the injury both arises out of and in the course of his employment. LSA-R.S. 23:1031. The two phrases "arise out of" and "in the course of" are not synonymous. "Arising out of" suggests an inquiry into the character or origin of the risk, and "in the course of" focuses on the time and place relationship between the risk and the employment. These two requirements must be considered together and a weak showing with respect to one of them may be compensated for a strong showing with respect to the other. Malone, Louisiana Workers' Compensation, §§ 162, 192, quoted in Jackson v. American Insurance Company, 404 So.2d 218 (La.1981).
In Jackson, supra, our Supreme Court considered whether an accidental death occurring while the worker was involved in a recreational activity met the dual requirement that the accident both "arise out of" and "in the course of" employment. In determining that the "arising out of" requirement was satisfied, the Court specifically considered two factors: (1) whether the recreational activity was mandatory, and (2) the degree to which the employer's purpose was served by the recreational activity. However, the Court cautioned that each case must be considered on its particular facts and not "oversimplified by its relegation to several boiler plate questions." The Court also stressed that the assessment of the question of coverage must be accomplished in light of the jurisprudence of our State.
As this Court has noted previously, the "arising out of" requirement has posed some problems for our courts. Sanders v. Chesson, 467 So.2d 1388 (La.App. 3 Cir. 1985). The main source of this problem has been the apparently conflicting views expressed in two supreme court cases. In Myers v. Louisiana Ry. & Nav. Co., 140 La. 937, 74 So. 256 (1917), the Louisiana Supreme Court said that the "arising out of" requirement would be satisfied if the risk from which the injury resulted was greater for the worker than for a person not engaged in the worker's employment. *343 In Kern v. Southport Mill, 174 La. 432, 141 So. 19 (1932), the Supreme Court used a different test which required the trier of fact to consider (1) whether the worker was engaged in his employer's business and not merely pursuing his own business or pleasure; and (2) whether the necessities of the employer's business reasonably required the employee to be at the place of the accident at the time the accident occurred.
Commentators have suggested that these apparently conflicting views are actually complementary and have given rise to a hybrid test incorporating the tests of Myers and Kern.
"That test, simply stated, is that whereas in Kernthe employee is actively at work or standing by for an immediate return to his task and thus is squarely within the course of his employment, virtually any risk will be considered as arising out of the employment, whether it is an "increased risk" or not.33 But where there is some doubt about whether the employee is within the course of his employment, compensation will be allowed only when the employment seems to have exposed the claimant to a greater risk than those to which the general population might have been exposed.34 To express this notion, Myers might be used."
W. Malone & A. Johnson, "Workers' Compensation Law & Practice", 13 La. Civil Law Treatise (2nd edition 1980), § 193, at page 393.
We have expressed our approval of this view that Myers and Kern are complementary. See Sanders v. Chesson, supra.
In the present case, I believe that, on the trip to Mexico, Palermo was exposed to a greater risk than those to which the general population is typically exposed. The risk of drowning in surf is not a risk typically faced by the general public. It was, however, a risk intimately connected with the trip taken by Palermo and his fellow employees. The purpose of the trip was to provide the employees with an opportunity to enjoy recreation on and off the Pacific coast of Mexico. The activity in which Palermo was engaged at the time of his death was a natural part of the venture.
The existence of a close connection between the trip and the risk which resulted in Palermo's death does not, in itself, satisfy the "arising out of" requirement. In the present case, and in similar cases involving recreational activity, the problematic relationship is not so much the one between the recreational activity and the risk as that between the recreational activity and the worker's employment. That is, the difficult question often is whether the recreational activity and the risk associated with that activity are sufficiently connected with the worker's employment to be considered a part of that employment. Specifically, in this case we must ask whether the trip itself was a part or an outgrowth of Palermo's employment. I think that it was.
As I noted above, one factor considered by the Jackson court in determining whether a recreational activity was part of the worker's employment was whether participation in the activity was mandatory. Although Robert W. Price testified at the trial that participation in the trip was not mandatory, I think that such participation was not free of compulsion. The offer to accompany the owner of the company on such a trip carries with it some degree of implicit compulsion. As our Supreme Court noted in Jackson, supra, citing Larson, Worker's Compensation, § 22.22, page 5-8 (desk edition 1977). "Compulsion need not take the form of a direct order, if the employee is made to understand that he is to take part in the affair." That Robert W. Price, Jr. did not intend to pressure the employees into taking the trip does not mean that they felt no compulsion. See Jackson, supra, 404 So.2d at page 220. Although one of the administrative employees declined to participate, that employee was the only woman administrative employee, was married, and, presumably, did not feel the same compulsion to go on the trip as Palermo and the other male employees.
*344 Another factor considered by the Jackson court in determining if the "arising out of" requirement was met was the degree of benefit derived by the employer from the recreational activity. In the present case, Contractors derived substantial benefit from the activity. The trip was first proposed to the administrative employees during a period of time when they were required to work long hours in an effort to complete the hotel before its opening date. The offer of the trip at this time meant that the trip became an incentive for the employees' hard work and for their timely completion of the construction. Indirectly, at least, Contractors derived substantial benefit from the trip.
There are additional factors which lend support to the conclusion that the trip was an incident of Palermo's employment. While in Mexico, Palermo received his regular salary and did not lose any accrued vacation time. Additionally, the trip was a way of compensating Contractors' administrative employees for the extra work which they had been required to do during the final months of the hotel's construction. The trip was, in the words of Robert W. Price, Jr., "a reward for a job done." The employees were not given a choice of going on the trip or receiving a bonus. It was the trip or nothing. If the administrative employees involved wished to enjoy any "reward" for their extra work, they had to accept the offer of the trip.
Given the above considerations, I believe that the trip and the activities engaged in by the employees while on it, including the activity which led to Palermo's death, were part of the employees' employment. The "arising out of" requirement as formulated in Kern, supra, was met. While on the trip, the employees were engaged in their employer's business and not merely pursuing their own business or pleasure. At the time of his fatal accident, Palermo was at a place where the necessities of his employer's business reasonably required him to be. Furthermore, as I have already pointed out, the test of Myers v. Louisiana Ry. & Nav. Co., supra, was satisfied, for the risk which resulted in Palermo's fatal accident was a greater risk than those to which the general population is exposed.
The remaining consideration is whether Palermo was within the course of his employment when the fatal accident occurred. An accident occurs in the course of employment when it happens during the time of employment and at a place contemplated by the employment. Guidry v. Sline Industrial Painters, Inc., 418 So.2d 626 (La. 1982). In the present case, although the accident took place on a Saturday, it is apparent that Contractors could and did call upon Palermo to work on weekends. In fact, testimony showed that during the last months of the hotel's construction, Palermo typically worked on weekends. Also, although the accident occurred away from the usual workplace, it was at a place which was ultimately chosen by Palermo's employer. I believe that Palermo's accident occurred in the course of his employment.
Accordingly, I find that the evidence does not support the trial court's conclusion that Palermo's accident did not arise out of and in the course of his employment.
NOTES
[1] Technically this action should be regarded as a dismissal under LSA-C.C.P. art. 1672 rather than the granting of a directed verdict under LSA-C.C.P. art. 1810 for the reason that the trial was before the judge and was not a jury trial.."